IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BUILDING TRADES UNITED PENSION
TRUST FUND, SCOTT REDMAN,
PAINTERS LOCAL 802 PENSION FUND,
PAINTERS LOCAL 802 HEALTH FUND,
PAINTERS LOCAL 802 APPRENTICESHIP
FUND and JEFF MEHROFF,

                Plaintiffs,

v.

HOWARD GROTE & SONS, INC.,

                Defendant.

OPINION AND ORDER

18-cv-812-wmc

---

In this civil lawsuit, various union funds and two of their trustees assert claims against defendant Howard Grote & Sons, Inc. ("HGS") based on its alleged failure to make required fringe contributions to the funds in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Before the court is plaintiffs' motion for summary judgment. (Dkt. #14.)[1] For the reasons that follow, the court will grant the motion as to plaintiffs' claim that defendant failed to make contributions to plaintiff Local 802 Pension Fund for employee Jeremy Calow in November and December 2016. In all other respects, however, the court will deny the motion because plaintiffs have failed to show by admissible, undisputed evidence that its proof is so one-sided as to rule out the prospect of ruling in favor of defendant HGS as to their other claims.

---

[1] Also before the court is defendant's motion to file a sur-reply. (Dkt. #32.) The court will grant that motion and has reviewed the proposed sur-reply and plaintiffs' opposition to it in considering plaintiffs' motion.

PRELIMINARY ISSUES

The parties' summary judgment submissions raise two disputes that the court must address before turning to the parties' proposed findings and arguments on summary judgment.[2]

### A. Purported Payroll Records

First, defendant objects to plaintiffs' reliance on documents described as "payroll records" on the basis that they are not admissible evidence. (Def.'s Resp. to Pls.' PFOFs (dkt. #23) ¶ 7.) There are two aspects to this argument. First, the documents plaintiffs attached as Exhibits 3, 4 and 5 to the declaration of plaintiffs' counsel Yingtao Ho were not payroll records for three different months as he declared. (Ho Decl. (dkt. #18) ¶ 4; *id.*, Exs. 3-5 (dkt. ##18-3, 18-4, 18-5).) Instead, these documents are actually pages from the remittance reports, which were also submitted as exhibits to a declaration by an administrator for the Painters Local 802 Funds. (Prebil Decl. (dkt. #19).) In its response to plaintiffs' proposed findings of facts citing to these purported payroll records, defendant correctly pointed out, among other things, that the "cited evidence does not support this proposed finding of fact." (*See, e.g.*, Def.'s Resp. to Pls.' PFOFs (dkt. #23) ¶ 7.)

A week after defendant's filing of its opposition to plaintiffs' motion, plaintiffs then filed three new exhibits to Attorney Ho's declaration without leave of court and without

---

[2] Both of these disputes arise out of sloppiness (or worse) by plaintiffs' counsel, a disturbingly consistent theme in this opinion as to plaintiffs' submissions at summary judgment. Plaintiffs' failure to abide by the straightforward rules for submissions on summary judgment at best reflects "fast and loose" sloppiness and disregard for their ethical obligations and at worst an attempt at an unethical "shortcut" where proof is lacking. Regardless, it demands greater care and attention to the accuracy of their submissions by this court and may be the subject of monetary sanctions should it continue.

any explanation. (Dkt. ##25, 26, 28.) While the court may excuse the sloppiness of attaching the wrong exhibits to Attorney Ho's original declaration, there is *no* excuse for not explaining this mistake and seeking leave to file these untimely exhibits. Moreover, in their replies in support of their proposed findings of facts, plaintiffs attempt to fault *defendant* for failing to explain the "basis of its evidentiary objection," which was patently clear: plaintiffs cited to documents purporting to be payroll records, but the documents are actually pages from remittance reports.

Even putting aside plaintiffs' failed and inexcusable sleight of hand with respect to the original exhibits, there is a separate problem with the admissibility of the late-filed exhibits ostensibly ushered in by the original declaration of Attorney Ho. In the reply in support of their proposed findings of facts, plaintiffs also argue that the substitute records are admissible over defendant's evidentiary objection because they were produced during discovery by defendant, and, therefore, "clearly constitute party opponent admissions." (Pls.' Reply to Pls.' PFOFs (dkt. #29) ¶ 7.) Again, plaintiffs' counsel is playing fast and loose with the record on summary judgment while failing to cite to any Federal Rules of Evidence or caselaw in support of his position. Certainly, the purported payroll records *may* fall within the hearsay exception as a business record under Federal Rule of Evidence 806(3), but they still must be authenticated. Fed. R. Evid. 803(6)(D) (for a business record to be admissible "all these conditions [must be] shown by the testimony of the custodian or another qualified witness"). Contrary to plaintiffs' position, the Seventh Circuit has explained that the production by an opposing party does *not* satisfy this requirement. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 578 (7th Cir. 2015) ("The mere act of producing

3

a document in response to a discovery request based on the content of the document does not amount to an admission of the document's authenticity.").

Whatever evidentiary value these "substituted" records may ultimately have at trial, therefore, the court declines to consider them in support of plaintiffs' motion for summary judgment, both on evidentiary grounds and as a sanction.

B. Wells Declaration

The second evidentiary dispute concerns a declaration of defendant's comptroller Maureen Wells. Among plaintiffs' claims is the assertion that defendant failed to remit contributions to the Painters Local 802 Pension Fund for work completed by its employees in Milwaukee based on the higher (as compared to Madison) hourly rate for Milwaukee-area work. (Pls.' PFOFs (dkt. #15) ¶¶ 42-44.) At summary judgment, plaintiff proffered evidence that for two months (August 2014 and January 2015), defendant paid contributions at the rate of $9.40 per hour for work by its employees. (*Id.* at ¶ 42.) For purposes of deciding the parties' evidentiary dispute, the court will infer, though plaintiffs do not explain or put forward evidence explaining, that the employees in question for those two months were based in Milwaukee, and, thus, plaintiffs assumed that the work was also Milwaukee-based. Regardless of whether these inferences are justified, however, plaintiffs put forward *no* evidence that the employees completed work in Milwaukee during the two months at issue.

Moreover, in response to plaintiffs' motion for summary judgment on this claim, defendant submitted Wells' declaration, in which she avers that Milwaukee-area employees were in fact working *in Madison* for the two months at issue, and, therefore, defendant

4

actually *overpaid* by contributing at a rate of $9.40 per hour, less than the Milwaukee rate, but more than the Madison rate. (Wells Decl. (dkt. #22) ¶ 21.) In reply, plaintiffs then objected to Wells' statement on the basis that she lacks personal knowledge to attest to the work location of the employees in question. (Pls.' Resp. to Def.'s PFOFs (dkt. #29) ¶ 24; *see also* Pls.' Reply (dkt. #31) 8-9.)

While the court is skeptical of plaintiffs' challenge -- Wells' position as comptroller would appear to give her access to business records detailing the location of defendant's employees' work, although in fairness she does not attach them to her declaration -- the court need not rule on this objection because *plaintiffs* failed to put forward any evidence that the employees at issue actually worked in Milwaukee for the hours at issue or otherwise show that the relevant provision of the Madison CBA applies to these employees. As a result, the court will have to sort out all of this at trial, where plaintiffs will have the burden to prove their claim, and defendant, through Wells or otherwise, can put forth evidence to rebut it.

UNDISPUTED FACTS[3]

A. **Overview of the Parties**

For all times relevant to the complaint, defendant HGS was party to, and agreed to abide by, the terms of the then operative collective bargaining agreements with the Painters' Union. Specifically, HGS was a party to the 2013-2018 agreement between

---

[3] During summary judgment, disputed facts are viewed in a light most favorable to the defendant as the non-moving party; however, this treatment does not extend to inferences supported by only speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

Painters District 7 and the Madison Area Finishing Contractors Association, Local 802 Jurisdiction ("Madison Area CBA"). As part of that agreement, HGS was obligated to remit certain payments to various Local 802 funds of the Painters' Union named in the complaint, which the court will refer to collectively as the "Painters Local 802 Funds." In addition, as just described above, plaintiff Building Trades United Pension Trust Fund is a Milwaukee-based fund and asserts a separate claim based on defendant's alleged failure to make contributions to its fund for work done in Milwaukee during August 2014 and January 2015.

### B. 2104 Edgewater Contributions

Plaintiffs principally seek contributions, liquidated damages and interest for work completed by defendant's employees in March 2014, April 2014, June 2014 and September 2014 in Madison, Wisconsin on a redevelopment project of a City landmark, the Edgewater Hotel. These claims rest on alleged discrepancies between monthly remittance reports defendant provided plaintiffs and defendant's own payroll records. For the reasons explained above, the court disregards plaintiffs' proposed findings regarding defendant's payroll records as unsupported for purposes of summary judgment. As such, there is no reason for the court to detail the remittance reports in isolation, other than to note plaintiffs' admissible and undisputed evidence of alleged underpayments:

1. For June 2014, HGS did not report any hours worked by employees Robert Grayburn, Alberto Noriega, Eric Rodenschmidt and Curtis Von Behren, but did list those employees in its July 2014 remittance report. (Pls.' PFOFs (dkt. #15) ¶¶ 6, 8.)

6

2. For April 2014, HGS's remittance report showed that Jeffrey Rolling, classified as a Painter, worked 177 hours, including 40 hours for the week of April 16. (Pls.' PFOFs (dkt. #15) ¶¶ 10-12.)

3. HGS submitted a remittance report for March 2014, detailing contributions for hours worked by apprentices. (Prebil Decl., Ex. 4 (dkt. #19-4).)[4]

In addition to asserting claims that defendant failed to make certain payments, plaintiffs also allege that defendant delayed payment. For the month of September 2014, HGS did not make contributions to the Local 802 Health Fund until December 14, 2014, and it did not make contributions to the Local 802 Pension Fund until October 18, 2016.[5]

---

[4] Plaintiffs' proposed findings of facts concerning the March 2014 contributions by apprentices all involve comparing the remittance report to payment records, which the court had determined are inadmissible at summary judgment. Moreover, the proposed findings of facts contain multiple spelling errors, detailing purported payroll records for individuals that were not employees. (*See, e.g.*, Def.'s Resp. to Pls.' PFOFs (dkt. #23) ¶ 23.) Through a supplemental declaration of Attorney Yingtao Ho submitted with plaintiffs' reply brief, plaintiffs also submit a September 2014 remittance report, which details the amounts owed to the Local 802 Health, Pension, and Apprenticeship Funds. (Ho Suppl. Decl., Ex. 2 (dkt. #30-2).) Again, however, plaintiffs failed to submit *any* admissible evidence at the time they filed for summary judgment in support of their argument that defendant failed to pay the September 2014 Apprenticeship Fund contribution. As such, while plaintiffs may press this claim at trial, the court will not consider it for purposes of summary judgment.

[5] Plaintiffs' propose a finding that "[t]o date, Howard Grote has remitted for 7,681 hours to the Local 802 Health Fund, 7.163.5 hours to the Local 802 Pension Fund, and 0 hours to the Local 802 Training Fund." (Pl.'s PFOFs (dkt. #15) ¶ 34 (citing Prebil Decl. Ex. 1; Ho Dec. Ex. 6.) Again, however, the documents plaintiffs cite for support do *not* contain this information. Page 5 of Exhibit 1 attached to the declaration of Kristina Prebil, reports 7,900 hours to the Welfare Fund, 7,820 hours to the Pension Fund and 7,900 hours to the Apprenticeship Fund. (Prebil Decl., Ex. 1 (dkt. #19-1) 5.) Exhibit 6 to Attorney Ho's declaration is a "check detail" report. Putting aside authentication issues, this document does not contain any information about hours; rather, it simply shows the amount of various checks dated January 2013 through May 2017. (Ho Decl. Ex. 6 (dkt. #18-6).) These are additional examples of plaintiffs' counsel's rampant errors in seeking summary judgment in this case.

In its own proposed facts, defendant explains that from 2014 through 2015, HGS served as a subcontractor to J.H. Findorff & Son Inc. on the Edgewater Hotel Redevelopment Project. HGS originally subcontracted for work in the amount of $1.4 million, and after changes and extra work in the amount of $600,134, the total subcontract price increased to over $2 million. During the project's initial months, HGS received payments much slower than it typically does when serving as a subcontractor.[6] Initially, HGS received payment no earlier than 60 days after invoice, which later increased to no earlier than 90 days, and, eventually, payment stopped altogether. In particular, HGS received a partial payment in November 2014 for work performed on the Edgewater Project earlier in 2014, which was the last payment HGS received for the project for over two years. Due to these delayed payments, HGS also fell behind on fringe benefit contributions that it owned to various employee benefit funds, including plaintiffs' funds.

In early 2015, HGS represents, also through its comptroller Maureen Wells, that it entered into discussion with plaintiffs in this action, via their counsel Christopher J. Ahrens, concerning outstanding contributions.[7] HGS further represents that on January 30, 2015, representatives from HGS, including Kurt Grote, Russell Grote, Attorney Anthony Varda and Maureen Wells, had a conference call with Attorney Ahrens. During that call, Wells avers that Attorney Ahrens acknowledged HGS's "difficult financial situation given the Edgewater Project and therefore agreed to work with HGS as it caught

---

[6] For purposes of summary judgment, the court takes judicial notice of the many public and private funding issues that plagued the Edgewater Hotel Redevelopment Project both before and during its life.

[7] Along with Attorney Ho, Attorney Ahrens is also plaintiffs' counsel of record in this action.

up on any unpaid contributions owed prior to that date." (Wells Decl. (dkt. #22) ¶ 11.) Wells further avers that "[w]ith respect to back fringe contributions, the parties agreed HGS would pay those amounts once Findorff resolved its dispute with the Edgewater's owner, at which time HGS would pay back fringes and Plaintiffs would not seek liquidated damages and interest on those amounts." (*Id.*)

Plaintiffs purport to dispute these statements, though they offer no evidence in support of their position. Instead, plaintiffs argue that these statements are immaterial because: (1) HGS did not assert a waiver defense in its answer; and (2) any waiver defense would fail as a matter of law. (Pls.' Resp. to Def.'s PFOFs (dkt. #29) ¶ 8.) These legal arguments are addressed in the opinion below.

Findorff resolved its dispute with the owner of the Edgewater in or around August 2016, and HGS received a final settlement in the amount of $401,000 at that time, which was roughly $500,000 less than HGS maintained it was owed. Regardless, there is no dispute that HGS then issued two checks to Painters Local 802 Funds: the first in the amount of $212,193.94, dated September 27, 2016, and the second in the amount of $124,351.59, dated October 18, 2016. Defendant contends that these checks "covered the outstanding fringe contributions alleged by Plaintiffs to be owned to the Local 802 Funds." (Def.'s PFOFs (dkt. #24) ¶ 16.) Furthermore, defendant maintains that "[b]etween October 16, 2016, and the commencement of this lawsuit, HGS never received any indication from plaintiffs that they did not intend to honor the January 30, 2015, agreement in which they elected to seek liquidated damages and interest on the Local 802

9

Funds' back fringe contributions."  (*Id.* ¶ 17.)[8]

C. Pension Contributions for Employee Jeremy Calow

HGS's remittance reports for 2016 show that first-year apprentice Jeremy Calow[9] worked a total of 1,026 hours on the Edgewater Project through November 2016: 89.5 hour in June 2016; 227.5 hours in July 2016; 192.25 hours in August 2016; 205.25 hours in September 2016; 175.5 hours in October 2016; and 136 hours in November 2016. Material to this claim for reasons explained below, Calow reached 1,000 hours in November 2016. HGS's remittance report for December 2016 shows Calow worked an additional 171.50 hours that month.

For December 2016, HGS's remittance report shows payment for 4,729 hours for the Welfare Fund and the Apprenticeship Fund. For the Pension Fund, the report shows payment for 3,767.50 hours, with the notation "**Under 1,000 Hrs." (Prebil Decl., Ex. 2 (dkt. #19-2)7.) Six of the employees, including Calow, are classified as "AP**," which plaintiffs represent stands for apprentice painter. The court further infers that the "**" means that these employees' hours have not been included in the calculated hours for the Pension Fund contribution because all employees had worked less than 1,000 hours.

Defendant does not dispute these basic facts, but points out that throughout 2016 and 2017, HGS was audited regularly by field auditors and none of the audit reports indicated that HGS failed to remit contributions to the Painters Local 802 Pension Fund

---

[8] Plaintiffs offer the same two objections to this statement as those asserted above with regard to the January 30, 2015, conversation.

[9] Plaintiffs refer to this employee as "Callow" with two ls. However, this appears to be a typographical error.

for hours worked after Calow reached 1,000 hours. Defendant further contends that any failure to remit timely was an "administrative error that HGS did not discover until after receiving Plaintiffs' Motion for Summary Judgment on liability." (Def.'s PFOFs (dkt. #24) ¶ 21.)

### D. Pension Contributions for Alleged Milwaukee Area Work

As described above, in August 2014 and January 2015, HGS paid contributions to the Building Trades Pension Fun at a rate of $9.40 per hour. The audit report shows an underpayment of $468.76. (Baranowski Decl., Ex. 1 (dkt. #16-1) 4-5.) Plaintiffs also seek liquidated damages and interest in the amount of $1,536.10. (*Id.* at 1.) Article VII, Section 1(a)(1) of the Pension Fund's Restatement of Trust explicitly authorizes the Trustees to collect liquidated damages on unpaid contributions as decided by the Trustees. (Baranowski Decl., Ex. 2 (dkt. #16-2) 13-14.) The Trustees set the rate of liquidated damages at "2.5% of each delinquent payment for every month the payment remains unpaid up to a maximum of 20%." (Baranowski Decl., Ex. 3 (dkt. #16-3) 12.)

Plaintiffs fail to propose material findings of facts in support of this claim. As best as the court can surmise from plaintiffs' *brief*, this claims is based on a provision of the Madison Area CBA, which requires employers working "outside of the territory covered by the Madison Area CBA [to] abide by all lawful provisions of the collective bargaining agreement in effect in said jurisdiction and executed by the employer and Painters Local union in that area, including fringe benefits." (Pls.' Opening Br. (dkt. #20) 12 (citing Ho

Decl., Ex. 2 (dkt. #18-2)).)[10]  There is no dispute HGS was never a signatory contractor to the Milwaukee Area CBA.  (Pls.' Reply to Pls.' PFOFs (dkt. #29) ¶ 42; Pls.' Resp. to Def.'s PFOFs (dkt. #29) ¶ 27.)  As of June 2014, the contribution rate to the Local 802 Pension Fund under the Madison Area CBA was $8.17 per hour.  Plaintiffs assert in their brief, but propose no facts or evidence in support, that the pension contribution rate under the Milwaukee Area CBA was $10.15 per hour.  (Pls.' Opening Br. (dkt. #20) 12.)

In addition to challenging whether any of its employees worked in the Milwaukee area for those two months (as discussed above), defendant contends that it owes *no* additional contributions, and actually *overpaid* the Pension Trust Fund by at least $13,000 for the period covered by Charles Baranowski's audit report.  Plaintiffs object to this proposed fact on the basis that it rests on an affirmative defense of "payment," which defendant did not plead.  (Pls.' Resp. to Def.'s PFOFs (dkt. #29) ¶ 24.)

OPINION

Only plaintiffs have moved for summary judgment.  A party seeking summary judgment on claims for which it bears the burden of proof "must lay out the elements of the claim, cite the facts [that] it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim."  *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir.

---

[10] The court could, and perhaps should, summarily deny plaintiffs' motion as to this Milwaukee-based work claim for failing to follow the court's summary judgment procedures.  (*See* Summary Judgment Guidelines § I(B)(3-4) ("The statement of proposed findings of fact shall include ALL factual propositions the moving party considers necessary for judgment in the party's favor. . . . The court will not consider facts contained only in a brief.") (available at dkt. #8).)  However, the court addresses this claim further below.

12

2015). With the exception of the claim concerning pension contributions for employee Calow, plaintiffs' submissions fall far short of this bar. Nonetheless, the court will walk through plaintiffs' various claims and address plaintiffs' argument that defendant may not dispute that it owes contributions because such arguments rest on affirmative defenses that defendant did not plead.

I. Failure to Make Contributions for 2014 Edgewater Project

As best as the court can understand plaintiffs' claims concerning defendant's work on the Edgewater Project, they generally fall into two buckets: (1) HGS failed to account for certain hours of work in calculating its contributions to the Local 802 Funds; and (2) HGS owes liquidated damages and interest on those unpaid contributions as well as on late contributions. As for the first category of claims, plaintiffs assert that defendant: (1) failed to report hours for four employees in its June 2014 remittance report; (2) failed to report 5.5 hours of "shift premium" work by Jeffrey Rolling in its April 2014 report; (3) failed to account for all apprenticeship classes and/or jobsite work for various apprentice employees in its March 2014 report; and (4) failed to account for all hours worked in September 2014 in its remittance report. (Pls.' Opening Br. (dkt. #20) 3-11.)

All of the claims in this first bucket require review of payroll records. Because plaintiffs failed to submit admissible evidence of the relevant employees' payroll records or otherwise support their claim that defendant's remittance reports were inaccurate, the court must deny plaintiffs' motion for summary judgment as to these claims. *See Hotel 71 Mezz Lender LLC*, 778 F.3d at 601 (requiring party with burden of proof to show record "so one-sided as to rule out the prospect of a finding in favor of the non-movant on the

claim").

As for the second "bucket" of claims, plaintiffs seek payment of liquidated damages and interest based on defendant's failure to pay its contributions timely. Specifically, for the month of September 2014, HGS did not make contributions to the Local 802 Health Fund until December 14, 2014, and did not make contributions to the Local 802 Pension Fund until October 18, 2016. Plaintiffs also contend, but provide no factual support, that HGS owed contributions to the Local 802 Apprenticeship Fund for this month and failed to make payments.[11]

As detailed above, defendant contends that in January 2015, plaintiffs agreed *not* to collect any liquidated damages or interest on these untimely payments. Plaintiffs respond that this argument constitutes an affirmative defense of waiver or payment, and defendant failed to plead this defense. Although perhaps distinguishable, plaintiffs cite support for this position. *See Fulton Dental, LLC v. Bisco, Inc.*, 860 F.3d 541, 544 (7th Cir. 2017) (a defendant could assert accord and satisfaction or payment as affirmative defenses based on deposit of funds into the court's registry); *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 235 (7th Cir. 1991) (holding that defendant was required to plead payment as a defense in challenging plaintiff's enforcement of a guaranty); *Matter of Excello Press, Inc.*, 890 F.2d

---

[11] As described above, Attorney Ho submitted a supplemental declaration with plaintiffs' reply in support of their motion for summary judgment, which attaches a September 2014 remittance report, showing that defendant owed $4,922.65 in contributions to the Apprenticeship Fund. (Ho Suppl. Decl., Ex. 2 (dkt. #30-2) 2.) Coming in reply, this evidence is obviously not properly before the court at summary judgment. Regardless, defendant disputes that this amount is owing. (Def.'s Resp. to Pls.' PFOFs (dkt. #23) ¶ 34.) Moreover, in their brief, plaintiffs cite to portions of the CBA describing treatment of delinquent contributions but again failed to offer any of this as proposed findings of facts in support of this claim. Finally, plaintiffs' argument as to the amount of liquidated damages and interest allegedly due is rambling and confusing. (Pls.' Opening Br. (dkt. #20) 15-17.)

896, 900 (7th Cir. 1989) (describing the "minority position" of a traditional debt collection action where "the plaintiff need only establish that the debt is owed and its amount" and that "[p]ayment is an affirmative defense").

In response, defendant argues that any failure on HGS's part to make all of the required contributions timely under the terms of the Madison Area CBA is an element of plaintiffs' ERISA claim, and as such this is simply an "ordinary defense" and not an "affirmative defense." *See* 29 U.S.C. § 1145 ("Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.").

As an initial matter, the court agrees that plaintiffs have an obligation to establish their right to liquidated damages and interest, something they have not done on summary judgment for reasons already explained above. Defendant's argument, however, appears to be that even if the terms of the Madison Area CBA require liquidated damages and interest on untimely payments, the court should not award such relief because plaintiffs waived that relief by entering into a new agreement on January 30, 2015. Viewed this way, defendant's "response" to plaintiffs' claim of liquidated damages and interest for the September 2014 contributions appears to fall squarely within the definition of an affirmative defense as it "limits or excuses a defendant's liability even if the plaintiff establishes a prima facie case." *Bell v. Taylor*, 827 F.3d 699, 704–05 (7th Cir. 2016) (citing *Tober v. Graco Children's Prods., Inc.*, 431 F.3d 572, 579 n.9 (7th Cir. 2005)). "In other

words, an affirmative defense is '[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true.'" *Id.* (citing Defense, Black's Law Dictionary (10th ed. 2014)).

This leaves defendant's argument that plaintiffs were not prejudiced by its failure to assert waiver formally as an affirmative defense, since they have been aware of this position since long before the lawsuit itself. This argument appears to have more traction in light of defendant's allegation that plaintiffs' counsel, who is counsel of record on this lawsuit, entered into this alleged agreement. Given that plaintiffs have yet to establish liability for this claim, the court is disinclined to take up whether defendant's failure to plead this affirmative defense to date should bar it from asserting the defense at trial. However, defendant's counsel would be well advised *not* to wait until trial before seeking leave to amend.[12]

## II. Calow Claim

Plaintiffs also contend that defendant failed to remit contributions to the Local 802 Pension Fund for hours first-year apprentice Jeremy Calow worked in November and December 2016. While plaintiffs failed to set forth certain critical facts in their proposed findings, there appears to be no dispute that Article XV of the Madison Area CBA, describing apprentice wages, provides "[f]or each apprentice indentured, the amount

---

[12] As noted, in their responses to defendant's proposed findings of facts, plaintiffs also question as a matter of law whether Attorney Ahrens had the authority to waive the Funds' right to liquidated damages and interest. Plaintiffs, however, did not develop this argument in their briefing, and the court declines to develop it for them. Instead, plaintiffs may want to ripen this issue in their trial brief, if not in response to any motion for leave to amend that defendant may seek.

specified in Article XIV as the contribution to the Pension Fund(s) will be paid *only* on hours worked on or after (1) the completion of one (1) year from the first workday as an apprentice *or* (2) the completion of 1,000 hours worked, whichever is earlier." (Ho Decl., Ex. 2 (dkt. #18-2) 20.) It is also undisputed that Calow hit his 1,000 hours of employment in November 2016. (Pls.' Reply to Def.'s Resp. to Pls.' PFOF (dkt. #29) ¶ 35 (listing hours, while noting plaintiffs' typographical error with respect to the July 2016 hours).) As such, plaintiffs maintain the defendant owes contributions to the Local 802 Pension Fund for 26 hours Calow worked in November 2016 and for 171.50 hours worked in December 2016. Finally, defendant does not appear to dispute that it owes contributions based on these hours. (Def.'s Resp. (dkt. #21) 6-7.)

Accordingly, the court will enter liability in plaintiffs' favor on the narrow claim that defendant is liable for unpaid contributions to the Local 802 Pension Fund for 196.5 hours worked by employee Jeremy Calow in November and December 2016. At $8.17 per hour, the amount of damages would appear to be $1,605.41, although the parties may object to this calculation in their respective pretrial briefs.

### III. Milwaukee Area

Finally, relying on an audit, plaintiffs contend that defendant failed to pay the higher Milwaukee-area rate of $10.50 for two months to the Building Trades United Pension Fund, resulting in an underpayment of $468.78 plus additional liquidated damages and interest. As already discussed, the evidentiary support for this claim is very thin. Specifically, plaintiffs neither propose findings of fact nor offer any evidence that the work at issue was actually performed in Milwaukee or otherwise subject to the relevant

provision of the CBA.  As such, for purposes of summary judgment, this claim fails on its face.

The parties' briefing raises two other, related issues that the court will address briefly as they are likely to resurface during trial of this matter.  *First*, plaintiffs did not offer the relevant provision in the Madison Area CBA in their proposed findings of facts.  In their brief, they paraphrase the requirement and direct the court to Article III, Section 2 of the CBA.  (Pls.' Opening Br. (dkt. #20) 12.)  That provision states in pertinent part:

> The Employer party hereto shall, when engaged in work outside the geographic jurisdiction of the Union party to the Agreement, comply with all of the lawful clauses of the Collective Bargaining Agreement in effect in said other geographic jurisdiction and executed by the Employer of the industry and the IUPAT affiliated Local Unions in that jurisdiction, including but not limited to, the wages, hours, working conditions, fringe benefits, and procedure for settlement of grievances set forth therein; . . . provided, further, that as to employees employed by such Employer from an outside jurisdiction, such employees shall be entitled to receive the wages and conditions including fringe benefits effective in either the home or outside jurisdiction, whatever are more favorable to such employees.  In situations covered by the last provision, fringe benefit contributions on behalf of such employees shall be made solely to their home funds in accordance with their governing documents, and the difference between the wages and benefit contributions required by the away funds and the home funds, if any, shall be paid to the employees as additional wages.

(Ho Decl., Ex. 2 (dkt. #18-2) 4.)

As the court reads this provision, plaintiffs must demonstrate that HGS employees engaged in work in Milwaukee to be subject to the higher pension fund rate under the Milwaukee CBA.  If Milwaukee-based employees were working in Madison, it appears that any right to higher-fringe benefit contributions would be owed to the *employees* themselves,

18

who are not parties to this action, as additional wages. At trial, plaintiffs should be prepared to present evidence consistent with the requirements of this provision of the CBA.

Second, defendant seeks to defend against this claim on the basis that it overpaid the Building Trades United Pension Trust Fund by at least $13,000 during the eighteen-month period from January 1, 2015, to June 30, 2016, having paid at the rate of $9.40, rather than the $8.17 rate required under the Madison CBA. Here, too, plaintiffs contend that this argument constitutes an affirmative defense of "payment" or "setoff" and defendant pleaded no such defense. In *Beloit Corp. v. C3 Datatec, Inc.*, No. 95-3309, 1996 WL 102436, 78 F.3d 586 (7th Cir. 1996), the Seventh Circuit explained that

> Under Fed.R.Civ.P. 8(c), payment is an affirmative defense that must be specifically pleaded. The rule applies equally to "any other matter constituting an avoidance or affirmative defense." If setoff can be distinguished from payment, it remains an "other matter constituting an avoidance". Beloit therefore had to alert C3 to its position.

*Id.* at *2. The court is inclined to agree with plaintiffs that defendant was required to plead that its $13,000 overpayment relieves them of any liability for this claim as an affirmative defense. Nonetheless, because plaintiffs have not demonstrated any right to unpaid contributions as part of this claim, defendant may wish to move as soon as possible for leave to add this setoff defense in advance of trial.

One final note. Because the court has a jury trial set to commence January 13, 2020, the bench trial set in this case will be held on Thursday, January 16, 2020, instead of Wednesday, January 15, 2020.

ORDER

IT IS ORDERED that:

1) Plaintiffs' motion for summary judgment (dkt. #14) is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED as to plaintiff's claim that defendant failed to make contributions to the Local 802 Pension Fund for 196.50 hours worked by employee Jeremy Calow in November and December 2016. In all other respects, the motion is DENIED.

2) Defendant's motion for leave to file sur-reply (dkt. #32) is GRANTED.

3) The court reschedules the bench trial for this case to January 16, 2020.

Entered this 17th day of December, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge